## GENERAL TIME INSTRUMENTS CORPORATION v. NEW HAVEN CLOCK CO.

### No. 249.

Circuit Court of Appeals, Second Circuit.

May 19, 1943.

W. B. Morton and H. Stanley Mansfield, both of New York City, for plaintiff-appellee.

Willis B. Rice, of New York City, for defendant-appellant.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff is a Delaware corporation which manufactures and sells electric alarm clocks as a part of its product and has its principal place of business in the Southern District of New York. The defendant is a Connecticut corporation which is in competition with the plaintiff in the manufacture and sale of such clocks and which maintains a regular place of business in the Southern District. It is the owner by assignment of United States Patent No. 1,-907,919 which was granted to Whitehead and Porter on May 9, 1933. It had for some time before this suit was brought charged that the plaintiff had been infringing all the claims of that patent by its manufacture and sale of electric alarm clocks. This suit was brought to obtain a declaratory judgment that the patent claims were invalid. Jurisdiction for that purpose is clear and unquestioned. The defendant filed a counterclaim in which it alleged infringement and sought an injunction and an accounting. The court dismissed the counterclaim on the merits; held all the claims of the patent invalid for lack of invention; and entered judgment accordingly. The defendant has appealed.

The patent, as the specifications state at the outset, "relates to synchronous clocks having means for storing and releasing energy, and particularly to synchronous clocks having means for storing relatively large amounts of energy to be released intermittently for giving alarms, signals and the like."

When the electrical current supplied generally for household use was brought to the point where good little synchronous electric motors would run evenly on it, and so would run for sufficiently long periods

---

[13] Hanover Insurance Co. v. Harding, 272 U.S. 494, 514, 47 S.Ct. 179, 184, 71 L.Ed. 372, 49 A.L.R. 713.

at a predetermined rate of speed, and such little synchronous motors were readily available it was probably inevitable that they would be used to energize the time train of clocks. Comparatively crude little motors of this type were first so used, so far as now appears, in 1896, in Cologne, Germany. They were not self-starting and if they stopped for any reason they could not start under the influence of the supply current alone. H. W. Warren was among the first to use such motive power in clocks in this country. He organized the Warren Telechron Company which as early as 1917, made and sold electric clocks with self-starting synchronous electric motors. As these were made better and better under the stimulus of the demand for improved motors for clocks, the alarm clock field became good territory for them.

The plaintiff and the defendant are both old and large makers of alarm clocks. Until 1929 they had both kept to the old spring actuated type of such clock but in that year the Warren Telechron Company came out with a buzzer alarm clock run by a synchronous electric motor which used the magnetism from the coil of the motor to make the buzzer sound the alarm whenever that was wanted.

The parties to this suit were then faced with that competition and they undertook to meet it with an electric alarm clock that would have the old chime alarm which had long been used in the old hand-wound clocks. This would at least differ in that respect from the Warren clock and the alarm might sound more pleasing than a buzzer, or so it was thought.

The patent in suit embodies the defendant's solution of the problem and the sole issue is whether any invention was disclosed and claimed. Upon reading the patent, we find that the gist of what it teaches is the use of the conventional time train run by the conventional synchronous electric motor which has enough surplus power to wind, without being pulled out of synchronism, a spring which actuates the chime alarm just as it would if that spring were kept wound by hand. Thus a clock so equipped, whether of the alarm type or not, would run as accurately as one not having the added spring provided that when the spring was fully wound it would not create resistance enough to stop, or change the speed of, the motor. There had to be some release, or its equivalent, which would let the winding mechanism attached to the motor go on turning and not be held motionless by the tightly wound spring. This needed release was right at hand in the shape of the old and well-known slip spring which when wound would simply stay wound while the constant winding energy supplied to it was dissipated through the slip so long as the resistance of the wound spring exceeded that of the slip. When some of the energy stored in the spring was used to actuate the chime striker to sound the alarm, the resistance of the spring would drop below that of the slip and then the spring would be re-wound until it was so tight again that the winding energy would make the spring slip. This action would occur and recur indefinitely. But as both the winding energy and the slip resistance were kept within the surplus power of the motor, that ran on at even speed and the clock, so long as it remained in good condition, kept good time.

With the motive power to run the alarm so easily stored in a wound spring and with a constant power supply to keep the spring wound as needed, all that had to be done in addition to make a synchronous electric alarm clock with a chime alarm was to install one of the old chime alarm bells and attach it to the spring just as such chimes had been hooked up to hand wound springs for years and years. Typical of all the four claims is No. 2: "2. In a clock mechanism of the character described, in combination, a synchronous motor, a time train synchronously driven by said synchronous motor, a clock signal train, connections between said motor and said signal train to drive the latter from the former including an energy storing device for accumulating energy during the periods of rest of the signal train to furnish the energy for the operation of the signal train to permit the signal train to operate at rest while the time train is driven by said motor without altering the speed of said motor and restraining means releaseable by said time train, for restraining the operation of said signal train."

■■ When read as it must be upon the disclosure, it covers nothing but the use of the old combined in obvious ways. A slip spring was used long before this in clock construction as shown by Groux in U. S. Patent No. 377,935; and by Campiche in British Patent No. 17,799; and Warren made use of one in the construction disclosed in U. S. Patent No. 1,564,-803. Though it is often hard to determine

when invention begins, we think it clear that the present standard for patent claim validity is too high to include this sort of thing. It would seem that a good mechanic, skilled in alarm clock making, would have to think of this way to put a chime alarm into a synchronous electric clock simply to maintain his right to be considered a good workman. In any event, there is nothing in the patent to bring it up to the plane of inventive thought required by Cuno Engineering Corporation v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. See also, Jordan Marsh Co. v. Wolff, 1 Cir., 80 F.2d 314; Tom Huston Mfg. Co., et al. v. Clyde Iron Works Sales Co., 6 Cir., 32 F.2d 558.

■ The commercial success claimed, though the sale of the electric chime alarm clocks has been sizeable, is really of little account on the question of invention when that is no more doubtful than in a case like this. DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Ruben Condenser Co. v. Aerovox Corporation, 2 Cir., 77 F.2d 266.

Affirmed.