GILLETTE SAFETY RAZOR CO. v. TRIANGLE MECHANICAL LABORATORIES, CORP.

No. 7260.

District Court, E. D. New York.

Aug. 29, 1935.

Henry R. Ashton and William J. Barnes, both of New York City, for plaintiff.

Morris Kirschstein, of New York City, for defendant.

CAMPBELL, District Judge.

This is a suit for the alleged infringement of patent No. 1,948,192, issued by the United States Patent Office, to Albert R.

Stargardter, assignor to Gillette Safety Razor Company, for method of treating steel, granted February 20, 1934, on an application filed March 10, 1932.

After notice to the defendant of its alleged infringement, the bill of complaint was filed May 24, 1934.

This suit is based on claims 1, 3, 4, 5, 8, and 11 of the patent in suit.

The plaintiff is a Delaware corporation, incorporated in 1917, and manufactures the Gillette safety razor and blades.

It is the successor of the original Gillette Company, a Maine corporation, incorporated in 1901, which shortly thereafter introduced the Gillette type razor and its double-edge flexible razor blade, a very large quantity of both of which have been sold.

In July, 1931, plaintiff put into production and sold blades made in a continuous strip, whereas they had formerly been handled throughout their manufacture as individual blades, and to distinguish those made by the new process from the blades made by the old process, the new blades were given a distinctive blue color by the application of a suitably dyed lacquer. The only blades on the market at that time were of the natural steel color.

In February, 1932, the plaintiff, by means of the process of the patent in suit, was able to produce blue color blades, which in appearance were greatly improved over the original lacquer blades.

I cannot agree with the defendant, that all the practice of the process of the patent in suit does is to give the blade a blue color.

By the patented process one step in the process of manufacture, the polishing operation, was eliminated, resulting in a substantial saving in cost.

Blades made by the patented process receive a very uniform rich blue color, by the formation thereon of a thin noncorrosive resisting and nonacid resisting coating of ferrous oxide (FeO). The nonacid resisting character of the coating enables the blades to be printed with trade-marks, trade-names, etc., merely by applying thereto a stamp wet with acid.

After printing, the blades are lacquered to prevent corrosion.

The patent in suit is for the method of hardening and simultaneously coloring such blades, by the formation of this iron oxide independently of the degree of hardness.

The defendant is a New York corporation. It manufactures only blades to fit the Gillette type razors, and does not manufacture razors, and claims to have begun the manufacture of oxidized blue blades in August, 1932.

There was an earlier action brought by plaintiff against the defendant for infringement of its trade-mark and for unfair competition, but the patent in suit was not in issue in the former suit. (D.C.) 4 F.Supp. 319.

The defendant has interposed an answer setting up the defenses of invalidity and noninfringement.

In the manufacturing process used by both parties, the steel from which the blades are made is kept in a continuous, unbroken strip during the various heat-treating, sharpening, and other operations, and until just prior to wrapping and packaging, when it is broken into the individual blades.

In the Gillette process, prior to the introduction of the blue blades as one of the initial steps, the blades were separated from the strip, and large packs of these blades were subjected to the heat-treating operation as a unit.

The patent in suit relates to a process for forming a blue ferrous oxide coating on steel, and more specifically to forming such a coating on perforated razor blade strip, while it is being heated above its critical temperature in a furnace preliminary to hardening.

It is true, as contended by defendant, that the words "ferrous oxide" do not appear in the patent, but the oxide produced by the practice of the process of the patent in suit is ferrous oxide, and as such clearly distinguished from magnetic oxide.

The patent in suit refers to two prior methods of softening steel, wherein oxide coatings are obtained; that is, tempering and blue annealing.

Tempering is an operation probably as old as the art of steel manufacture. It is useful in reducing brittleness and increasing toughness.

If a piece of steel, previously hardened by heating above the critical temperature and rapid cooling, be polished and then reheated to about 430° F. it takes on a straw color, and if heated to about 565° F. it turns dark blue. In the range of tempera-

ture 430°–750° F., which is considerably below the critical temperature, a whole range of colors is obtainable from straw through the various shades of blue to gray.

The color was not desired but was indicative of the final hardness, and is used by toolmakers to tell them when their steel has been reheated to the proper temperature after hardening.

The highest temperature to which steel has been heated in the tempering operation determines the hardness and toughness of the steel. The steel will be softer the higher the temperature. The tempered razor strip Exhibit 21, shows that steel, with an average hardness of 875 Vickers before tempering, was reduced in hardness in the straw region to 725, and in the blue to 650; the latter being too soft for the cutting edges of razor blades. The mode of cooling from the tempering temperature is not important in so far as the effect upon the hardness of the steel is concerned.

The custom in toolmaking to heat the steel in the open air until the desired temper color appears is of long standing, and the toolmaker then knows that the steel, when cool, will have the required combination of hardness and toughness for the work to be performed. The temper colors are usually polished off to improve the appearance of the tool. Exhibit 26 gives the colors recommended for various tools, and while certain devices, such as screw drivers and wood saws, requiring great toughness, are recommended to be tempered a blue color, they do not require anything like the degree of hardness necessary for razor blades. Tempered blue razor strips Exhibits 23, 24, 27 may be given a permanent set or bent double before breaking; the edges of a razor blade, however, are necessarily much harder, and thus unavoidably more brittle.

The edges of both plaintiff's and defendant's blades are subjected to tempering within the range of 260° to 380° F., and therefore the hardness of the blades is decreased but slightly by such tempering, just enough tempering having been done to relieve the excessive brittleness of the strip as it comes from the furnace.

The temperatures of such range are not only far below the blue range, but also below the entire temper color scale, and no colors would appear on polished steel as a result of heating to such low temperatures.

A reference is also found in the patent in suit to the bluing of soft steel. Such steel is usually in the form of sheets and is generally known as blue annealed sheet, and has been heated above its critical point and cooled relatively slowly, instead of being quenched as in hardening. As finally treated it is quite soft, and in some cases softer than the steel before treatment. It is unsuitable for razor blades.

In manufacture, sheets heated well above the temper range, and sometimes above the critical temperature but not always, are subjected to superheated steam, air, or other oxidizing gas while highly heated, which forms a magnetic oxide coating upon the steel commonly designated as blue, but actually it is usually a mottled bluish-black, more nearly resembling black.

This oxide is the so-called magnetic oxide, $Fe_3O_4$ and has some value as a rust preventative, without regard to its color. The color is only a secondary consideration, and actual uniformity of color, which is of no consequence, is never attained. The composition and color of this oxide is different from the blue coating of ferrous oxide produced by the process of the patent in suit, and the steel on which it is formed differs in that it is soft steel.

The object of the invention of the patent in suit is set forth by the patentee in his specification, in which he says: "I have discovered that by subjecting steel under certain conditions to the action of an atmosphere having a controlled oxidizing effect, a blued finish may be imparted to it independently of hardness or temper. It is thus possible for the first time to produce steel articles of any desired degree of hardness having a blued surface finish of a character highly prized in cutting devices and other steel articles."

The steel receives this blue finish while it is in the furnace being heated above the critical temperature, preparatory to hardening by subsequent quenching by carefully controlling the oxidizing power of the atmosphere within this furnace, by having present regulated quantities of oxidizing and reducing constituents, that is, gases which either add oxygen to the steel so as to form an oxide, or remove it, or form a lower oxide if already there.

He further says, with reference to the extent to which the oxidizing action of these constituents should exceed the reducing action: "in all cases the oxidizing ef-

fect of the gas mixture to which the steel is subjected is less than that of the atmospheric oxygen, as otherwise, at the temperature I employ, the color of the steel would be carried beyond the blue."

If the atmosphere within the hardening furnace was constituted of ordinary air in a most restricted quantity, the steel would be coated with a more or less nonadherent coating of black magnetic oxide. Magnetic oxide is readily produced at elevated temperatures, with an active oxidizing agent such as air, and would similarly be produced by any other oxidizing gas with nothing more. It contains relatively more oxygen than ferrous oxide.

Recognizing the necessity of lessening the oxidizing power of this atmosphere by adding a reducing constituent, the patent discloses that a controlled amount of ordinary illuminating gas, which has a reducing act upon steel, even at high temperatures, should be introduced with air entering the hardening furnace. The mixture resulting from the addition of such gas to air within the furnace is but slightly oxidizing to the steel at the temperature of the furnace, being less than that of atmospheric oxygen.

The patentee desired a blue coating, but realized that by varying the relative proportions of oxidizing and reducing constituents produced in the furnace, he could control the tint or shade of the finish, and could obtain other colors resembling those of the temper scale, but the color, he said, "gives no indication of the temper of the strips but is imparted thereto by a novel sequence of steps which permit the steel to be subsequently treated and tempered to any desired degree."

Referring to the patent drawing, this special atmosphere is maintained within the elongated muffle 20 through which the steel strips 30 pass. Two blade strips are shown, although in actual practice only one is used. This muffle, which is made of a heat resisting alloy, is located within a hardening furnace 10, heated by the gas burners 14 at the sides, but other types of furnaces may be employed, both parties here employing electrically heated furnaces. An auxiliary muffle 18 surrounds the muffle 20. Ordinary air is introduced through the pipe 24 at the entrance of the muffle, and illuminating gas through the pipe 26. The supply of each of these gases is controlled independently by valves 26, Fig. 3.

The gases from the rear of the muffle pass out through the muffle stack or vent 22, and the holes 12 in the top of the furnace. After leaving this furnace, the strip is passed between the dry cooling block 32, where it is hardened by the sudden cooling. Such dry quenching is necessary to preserve the blue finish imparted in the furnace. If quenched in oil, as in ordinary toolmaking, the blue oxide is changed to a black, scaly coating, such as on Exhibit 54. The quench blocks 32 are close to the furnace exit, so as to prevent additional oxidation in the open air, which would further oxidize the blue ferrous coating and produce a loose scale of magnetic oxide on the strip. After quenching, the strip is tempered in the furnace 34, also without injury to the blue finish.

The patentee further said: "The behavior of the oxidizing mixture within the muffle 20 is not entirely understood."

This, however, does not invalidate the patent, as it is not necessary that the inventor understand the theory underlying his invention. Eames v. Andrews, 122 U. S. 40, 55, 7 S.Ct. 1073, 30 L.Ed. 1064; Hemolin Co. v. Harway Dyewood & Extract Mfg. Co. (C.C.A.) 138 F. 54, 55; Danbury & Bethel Fur Co. v. American Hatters & F. Co. (C.C.A.) 54 F.(2d) 344, 345.

The attempt of the patentee to explain the operations which occur in the furnace muffle was right as far as it went, as some of the oxidizing action is attributable to carbon dioxide, which is formed from the burning of the carbon monoxide in the illuminating gas. It has also been found, since the application was filed, that water vapor is also present and contributes largely to the oxidation process.

It is the belief of plaintiff's expert, and I agree with him, that the reaction within the furnace is as follows: Illuminating gas, in a controlled amount being admitted with air to the muffle, at a temperature above the ignition point of mixture, burns until all the oxygen of the entering air is consumed. Gas analyses of the atmosphere within the muffle show that no free oxygen remains after a very short distance, which may be only a few inches, and before the steel has become heated more than a few hundred degrees. The defendant's expert admitted "illuminating gas burns part of the oxygen out of the air and therefore leaves you an atmosphere of less oxidizing effect."

In burning, some carbon monoxide from the illuminating gas unites with oxygen from the air and is converted to carbon dioxide; hydrogen from the gas is partly converted to water vapor; methane is changed to carbon dioxide, carbon monoxide, and water vapor; nitrogen from the air is inert and remains unchanged. After this partial combustion has taken place in the front portion of the muffle, the products of this combustion, together with the unburned illuminating gas, flow to the exit end of the muffle, in contact with the highly heated steel strip, and produce thereon the desired blue coating. The steel is subjected to this mixture, which is made less oxidizing in its effect than atmospheric air by controlling the relative proportions of the entering gases. It is not possible to specify the exact proportions of entering illuminating gas and air, because these vary according to many factors; for example, the temperature employed, furnace lengths, strip speeds, and the particular color desired. The patentee described and illustrated valves in the gas and air supply pipes, to regulate these proportions for a given set of conditions. This is all he was required to do.

The mixture of gases within the muffle includes reducing constituents, principally, carbon monoxide and hydrogen, and also oxidizing constituents such as carbon dioxide and water vapor, the latter a powerful oxidizing agent. It is this combination of gases of controlled oxidizing effect which reacts with iron in the steel and forms the desired ferrous oxide coating.

After leaving the muffle, the unburned illuminating gas, which could not burn, although highly heated, because of lack of free oxygen, comes in contact with air which supplies sufficient oxygen to support complete combustion of the gas. The products of this final combustion do not contact the strip under treatment. If they did so, the appearance of the strip would undoubtedly be impaired.

This manipulation is referred to by the patentee in his specification as an important characteristic of his invention, who, says: "In so confining and handling the gas current, that it is conducted or directed away from the heated strip for complete combustion and allowed to burn only at a point remote therefrom." And later says: "Any substantial amount of the mixture is, however, prevented from burning within the muffle 20 * * *." After leaving the duct 22, the oxidizing gas mixture is free to ignite and burn either within the furnace chamber or after it has passed upwardly through the duct 12 in the upper wall of the furnace chamber. In any case, the complete combination of the gas takes place at a point remote from the strip steel being treated, so that the latter is kept from contact with the products of this combustion.

▇ I do not agree with defendant's expert's interpretation of some of the language quoted, as teaching that no combustion whatever was to occur within the muffle, nor can we consider as collateral information, the file-wrapper arguments of the patentee's attorney in derogation of the disclosure which the inventor made in the patent itself. A. G. Spalding & Bros. v. John Wanamaker, New York (C.C.A.) 256 F. 530, 533.

As I interpret the patent, it was only the final or complete combustion which should not occur within the muffle.

The product of the process of the patent in suit is a strip of perforated razor steel, which has been hardened at the edges from about 260 Vickers, the hardness of the entering strip, to about 875 Vickers, and coated with an adherent blue layer of ferrous oxide as illustrated by Exhibit 14. Its coating may be etched, or printed, with extreme rapidity by acid.

The six claims in suit read as follows:

"1. The method of producing colored and hardened strip steel, which consists in heating the strip to a temperature above its critical point, immersing the strip so heated in a gaseous mixture having a reducing constituent but being oxidizing in its effect, and then chilling the strip to harden it as thus oxidized."

"3. The method of hardening and uniformly coloring steel, which consists in heating it to a temperature at or above its hardening point, simultaneously subjecting it to the action of an atmosphere having a controlled oxidizing effect which is less than that of atmospheric oxygen, and then chilling it to produce a hardened and colored steel product.

"4. The method of hardening and coloring steel, which consists in heating it to a temperature at or above its hardening point while exposed to an atmosphere having an oxidizing effect less than that of atmospheric oxygen, and then removing the steel from such atmosphere and at once chilling it, thereby producing a hardened and colored steel product.

"5. The method of hardening and bluing strip steel, which consists in heating the strip to a temperature at or above its hardening point, meanwhile enveloping the heated strip in a moving current of oxidizing gas of less oxidizing effect than atmospheric oxygen, and thereafter chilling the strip, thereby producing a hardened and blued steel strip."

"8. The method of hardening and bluing strip steel, which consists in passing the strip through an elongated furnace containing an oxidizing gas of less oxidizing effect than atmospheric oxygen, heating the furnace and the gas contained therein to a temperature above the lower critical point of the steel, and then chilling the strip progressively as it leaves the furnace, thereby producing a hardened and blued steel strip."

"11. The method of treating strip steel, which is characterized by the steps of progressively heating successive zones in the strip to a temperature above the critical point of the steel, subjecting each zone as heated to the action of a gas mixture having a controlled oxidizing effect which has less oxidizing effect than that of atmospheric oxygen, progressively chilling the strip as it leaves the oxidizing atmosphere, and subsequently heating the strip to temper it independently of the oxidized color imparted thereto."

Claim 1 is drawn specifically to a reducing constituent while each of the remaining claims calls for a mixture having an oxidizing effect less than air.

No separate consideration of these claims is necessary, as they are drawn to the same general process, and differ but slightly in terminology concerning the way in which the controlled atmosphere is defined.

The following are the essential features of the claims:

(a) Heating and maintaining the steel, for the requisite length of time, at about 1400° F., which is slightly above the critical temperature; and while that temperature is being reached and held

(b) Subjecting the steel to the proper atmosphere containing both oxidizing and reducing gases and which is less oxidizing in its effect than air; then

(c) Quenching the steel while it is slightly above that critical temperature to harden it in that condition.

Notwithstanding the fact that by pleadings and correspondence between counsel, defendant has asserted many patents and publications against the patent in suit, it has contented itself by relying at the trial upon twenty-three patents and several publications as prior art.

There were selected by the defendant's expert as the best references, patent No. 1,626,713, to Alexander and Imbery, and patent No. 1,732,244, to Salzman, which I will consider in the order named.

Patent No. 1,626,713, issued to Herbert Alexander and Arthur Imbery, for apparatus for the electric-heat treatment of wire, strip, and the like, granted May 3, 1927, on an application filed December 29, 1924; the purpose being the hardening and tempering of the wire, strip, and the like. Reference to Fig. 1 shows that the wire or strip A enters at the top left of the figure and passes over a drum B. It then travels downwardly through the tube C; more clearly shown in Fig. 5. The admission of gases into this tube is provided for through the valves at the upper and lower ends. From this tube the wire passes into a liquid quenching bath D, below the surface of which is an electrical contact E over which the wire passes. The wire in its travel through the apparatus is heated by the passage of an electrical current therethrough between the drum B and the contact E. It is subsequently quenched in the liquid bath D, to harden the wire, and passes under the drum A, and up over the drum B'. Thereafter the wire is again heated in a similar manner between B' and contact E', and after again being quenched leaves the apparatus.

I cannot agree with the defendant's contention that this reference has the essential features of the patent in suit, and that "this patent is for all practical purposes a brief text."

Under the teaching of that patent, an electric current is to flow through the wire and heat it to above the critical temperature. I am convinced that you could not, by the so-called electrical resistance heating, raise the perforated blade strip above the critical temperature, however satisfactory it might be for heating wire and imperforate strip.

The strip in defendant's process is and must be perforated before it is hardened, as the attempt to perforate it after hardening would, due to the hardness of the steel, cause it to shatter. This first sugges-

tion is impractical as applied to razor blade strip.

Provision was also made for introducing an inert gas, but the patentees erroneously said hydrogen was inert.

The part most relied on by the defendant is the statement reading as follows: "If it be desired to obtain black or colored wire this can be effected by admitting air or other oxidizing influence to the traveling wire."

This is the complete disclosure of that patent of an atmosphere for blackening or coloring wire, and air is the only gas specifically mentioned; the only restriction upon the use of other gases is that they be oxidizing to the heated wire.

This atmosphere does not correspond with that of the patent in suit. There is no disclosure of a reducing constituent. While air and other oxidizing gases would be sufficient to produce black wire, as it would produce the usual black magnetic oxide which would protect the wire from corrosion, it would not be possible to produce bluing with a ferrous oxide, without having a reducing gas present. The teaching of that patent is of no assistance in producing a blue ferrous oxide coating upon perforated blade strip.

The patent further proposed to quench heated wire in a liquid quenching bath D, to harden it.

This seems to me to be much more than a mere detail.

It is a fact, and it was known to the patentee of the patent in suit, that oil used for quenching discolors a blue strip, who says in his specification: "Preferably the steel is dry chilled between cooled plates since the appearance of the blued finish of the steel treated in such manner is superior to that of steel quenched in water or oil."

If these criticisms be met as suggested by defendant's expert, by combining the gas heated furnace of Edison, in place of Alexander's electric resistance heating, and replace his liquid quenching by the quenching of Salzman, there is little left of the Alexander reference.

The invention of the patent in suit was not taught by the Alexander patent.

■ Patent No. 1,732,244, issued to Samuel I. Salzman, for method of hardening steel, granted October 22, 1929, on an application filed March 29, 1928. That patent was cited as a reference against the patent in suit by the Patent Office, and the patent issued over it, and that strengthens the presumption of validity of the patent in suit. Smokador Mfg. Co. v. Tubular Products Co. (C.C.A.) 31 F.(2d) 255, 257; Ensign Carburetor Co. v. Zenith-Detroit Corporation (C.C.A.) 36 F.(2d) 684, 686.

This reference shows apparatus for hardening and tempering razor blade strip. As shown in Fig. 1, the strip passes through a muffle 17, within the hardening furnace 18. This muffle is heated by the gas burner 19, which lies below it in the furnace. After hardening by the quench blocks 20, the strip is tempered.

The patentee points out that at the time of his invention, it was customary in hardening razor blades to assemble them in stacked and interleaved relation with sheets of copper, and then says: "The practice of the foregoing method prevents penetration of the blanks by oxidation, except over limited areas, during the heating and chilling operations, an effect which would otherwise render the blanks useless owing to their thinness." And then says: "The method and apparatus embodied in the present application are intended to conserve the advantage of the older type of heat treatment in respect of preventing oxidation."

The only other reference to oxidation to be found in the patent is: "Heating and chilling of the strip 10 are effected without oxidation thereof * * *."

Bluing is not disclosed in that patent, and the only statements about oxidation are that it should be prevented.

I cannot agree with the contention of defendant's expert, that the meaning of the word "oxidation" is not clear, and "it is just possible that by oxidation here he means scale formation."

The contention of the defendant that, if Salzman permitted a slight amount of air to enter the muffle, he would get some oxidation, is contrary to his teaching that there should be no oxidation.

The admission of air alone is not sufficient to accomplish bluing, and Salzman had no provision for admitting gas; in fact, no gas could be supplied to the steel from the gas burners because of the tube in which it travels.

■ In view of the fact that the patent specifically states that there should be no oxidation, the process of the patent in suit cannot be anticipated by Salzman, by stat-

ing how his apparatus might operate contrary to that specific statement. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 424, 22 S.Ct. 698, 46 L.Ed. 968; Rockwood v. General Fire Extinguisher Co. (C. C.A.) 8 F.(2d) 682, 686.

The Salzman patent does not disclose the invention of the patent in suit.

It will be sufficient and most convenient to consider the remaining twenty-one patents relied upon by the defendant in three groups, arranged in accordance with the purposes of the various patents.

At least one typical reference in each of the three groups was considered by the Patent Office before it issued the patent in suit; therefore the presumption of validity is strengthened.

The first group of these patents, referred to herein as Bower-Barff references, relates to the production of a coating of magnetic oxide upon iron and steel articles likely to be subjected to corrosion or acids.

It is not suggested that the articles treated are to be hardened for any purpose, or that they are to be given any coating other than magnetic oxide to obtain its protective qualities.

The articles are heated for a long time during the formation of the coating. In one instance it takes nineteen hours. Defendant's blades are blued in eight or nine seconds, and plaintiff's, a longer furnace and lower temperature being employed, in forty-four seconds.

Patent No. 234,524, issued to George Bower and Anthony S. Bower, for coating iron with oxide, granted November 16, 1880, on an application filed September 3, 1880. The object is stated as follows: "This invention relates to the protection of cast or wrought iron and of cast or wrought steel surfaces from oxidation or corrosion by atmospheric or other influences; and it consists in the formation of a protective film or coating thereon of oxide or of oxides of iron by the action of carbon dioxide ($CO_2$) at a suitable temperature."

Bower intends to form a coating of the "magnetic or black oxide" to resist such corrosion, and refers to this coating as "a film of the requisite magnetic oxide."

The resulting film is black and is magnetic oxide.

Although the film of magnetic oxide may be formed by carbon dioxide alone, Bower states that it is advantageous to carry out his process in two steps. First, he heats the articles with carbon dioxide and an excess of air for one-half hour to form the sesquioxide of iron $Fe_2O_3$. Then he reduces this by carbon monoxide for three minutes, so as to form the magnetic oxide. These operations may be continued as often as necessary according to the thickness of the protective film required.

In this as in the other references in this group, the articles are treated in separate batches, Bower's process not being adapted to continuously moving strip. Bower says that the preferred temperature ranges from a dull to a bright red heat, but defendant's contention that this means that Bower was working above the critical temperature does not necessarily follow. Bower did not need to heat above the critical temperature, as he was not concerned with changing the hardness of the steel articles, and a coating satisfactory for his purposes could be obtained by heating at lower temperatures, and the temperature indicated is much below the critical temperature of wrought iron which he proposes to treat by this process. Exhibits 49, 50, and 51 are typical examples of Bower-Barff coating, and the magnetic oxide coating on them is a dense black of considerable thickness which may be easily chipped off, and has been successfully applied to resist corrosion and acids.

The oxide coating on a blue blade of the patent in suit is measured in millionths of an inch, and is instantly dissolved by a touch of acid, and such blades rust so easily that in the Gillette plant the coils of strip are oiled immediately after the tempering operation, although this oil must be removed during the process, and dependence is placed upon lacquer exclusively for resistance to corrosion of its oxidized blades.

Patent No. 382,447, to William T. Wells, for process of coating iron and steel with rustless oxide, granted May 8, 1888, on an application filed November 18, 1887. It is stated to be an improvement upon the Barff and Bower patents to which reference is made, and relates to the protection of iron and steel articles by the production of a rustless coating thereon.

The patentee says that the best method which he has discovered for carrying out the invention involves four steps, in the following order: He heats the articles for twelve hours, introduces steam for one-

half hour, introduces carbon monoxide for one and one-half hours, and finally treats with both steam and carbon monoxide for five hours, and says: "This last or fourth step is the essential step of the process, and is the one in which is produced the effective rustless coating of black or magnetic oxide that is sought."

Wells did not want less than atmospheric oxidizing power. What he wanted was a rustless oxide.

Patent No. 367,046, to Abram A. Breneman, for process of coating iron and steel with rustless oxide, granted July 31, 1888, on an application filed January 10, 1888. The patentee says that it is well known that the magnetic or black oxide of iron is not oxidizable under ordinary conditions of exposure, and that the object of his invention was to provide articles or iron with a substantial and uniform coating of the magnetic oxide. He first reduced the surface of the articles to be treated to the state of metallic iron, preferably by the use of any ordinary illuminating gas. His next step he said was to "convert the metallic iron into the magnetic oxide, and in carrying out this step I subject the articles to the action of an oxidizing agent, and I preferably make use of ordinary air, as this is the best and most available agent."

A single subjection of the articles to this oxidizing agent would in some cases produce a uniform coating of the magnetic oxide, but if it did not he would again, after the first coating had been formed, submit the articles to the reducing action of the gas, obtaining a coating of metallic iron, and then again admit the oxidizing agent. He says: "This alternate and successive treatment may be followed until a coating of oxide of the required or desired thickness is produced, and it will be observed that at each action, the surface is first uniformly reduced to the state of metallic iron, and finally converted into a continuous and uniform coating of magnetic oxide by the oxidizing agent. In this way the coating of magnetic oxide, instead of being in a series of layers corresponding to each successive operation, is produced as a single homogeneous layer, covering every portion of the surface, and interlocking with the particles of the metal upon which it rests."

Patent No. 1,039,034, to Robert W. Davis, Jr., assignor to Pennsylvania Salt Manufacturing Company, for method of manufacturing electrodes, granted September 17, 1912, on an application filed May 25, 1912. The electrodes he says are made "by converting portions of a shaped iron or steel article into magnetic oxide of iron."

Such oxide of the proper character for electrode use is formed by heating the articles with an excess of hydrogen in the air to guard against the formation of ferric oxide $Fe_2O_3$, which would make his articles useless for electrolytic work. "Layer after layer" of the magnetic oxide is to be formed until the coating is of the desired thickness and properties.

Patent No. 1,362,213, to Ernest P. Andrews, for rust-proofing process, granted December 14, 1920, on an application filed December 22, 1919. This process, the patentee says, makes the articles "rust-proof at and below the surface and have a surface like polished ebony."

That patent was cited by the Patent Office during the prosecution of the patent in suit, and defendant's expert said: "it is worthy only of a brief mention." The process is described as follows: "In the process constituting my invention, moisture and gases are excluded from the pores or interstices of the article to be rust-proofed, the article being first cleaned by dipping in oil, then being passed into and through a furnace in which is maintained an oxidizing atmosphere at a temperature approximating 650 degrees centigrade, thus forming a coating of magnetic oxide over the surface of the article. Immediately upon issuing from the furnace the article is immersed in cotton-seed oil. This renders the coating permanent or fixed. Cotton-seed oil produces the best results known to me, but whale oil may be used and it is probable that other oils may be found which will also serve the purpose."

Whatever usefulness, if any, this reference might have against the patent in suit, the suggestion that the hot articles may be immersed in whale oil renders it useless.

The next group of references are examples of the blue annealing mentioned in the patent in suit, and may be referred to as "Blue Annealing References."

They relate to the production of oxide coatings upon soft steel, usually softer than the Gillette blade strips before hardening.

The Shannon book, "Sheet Steel and Tin Plate," page 134, says: "Common open annealing creates a rather thick lay-

er of oxide, dark blue in color, all over the outside surfaces of the sheets. For this reason, sheets marketed without further treatment after open annealing have come to be called 'Blue Annealed' sheets. Standard blue annealed sheets may carry scale so thick that it tends to loosen in patches. It is possible, however, to make common blue annealed sheets with a relatively light, and therefore relatively tight, scale, but such sheets, generally, are not so thoroughly annealed as blue annealed sheets which carry heavier scale." (See his classification of various sheets on page 230).

Patent No. 630,867, to Wallace C. Dickey, for manufacture of planished iron and steel, granted August 15, 1899, on an application filed May 13, 1899. The process is described as follows: "These sheets are then annealed in a box-annealing furnace at customary heats. Instead of laying the sheets down on their sides, as generally practiced, I stand them on their edges and preferably, though not necessarily, fill the annealing-box with some hydrocarbon gas during the annealing process. When sufficiently annealed, the box is withdrawn from the furnace and allowed to cool slightly, keeping the edges well together to exclude free access of air. Then 1 introduce a jet of superheated steam * * * and maintain it there until the temperature is reduced to about 300° or 400° Fahrenheit."

Dickey said that the sheets treated in this way will be found to have a blue ferrous oxide coating, which is excellent to resist corrosion.

I am convinced that the last statement is erroneous. Superheated steam is a powerful oxidizing agent, and what it formed would be a magnetic oxide and not a ferrous oxide.

After painting the sheets so treated with a composition of graphite and the oxide or salts of tin or lead, or both, and heating to a red heat, they are hammered until a high lustre is acquired. The final product is suitable for stove pipes and parts.

Patent No. 651,461, to John Jenkins, for annealing and bluing furnace, granted June 12, 1900, on an application filed October 14, 1899. As shown in Fig. 1, the furnace is in two parts. The first part A is a heating chamber through which the sheets pass inside a muffle 6, being heated by the gas burner 1. The second part B is a cooling chamber through which the muffle also extends. The entrance and exit of the muffle are provided with swinging flaps 7 to "prevent the escape of heated air and to exclude cold air." By this arrangement Jenkins hopes to attain greater thermal efficiency. If the sheets are to be annealed only, the cooling chamber is used so that the sheets are expelled to the air comparatively cold; if they are to be blued, this chamber is not needed, the sheets being expelled at a higher temperature so as to oxidize more easily.

The flaps 7 would permit considerable air to enter the muffle, so that the sheets are heated in ordinary air and so oxidize even before being expelled either from the heating chamber A, or the cooling chamber B.

The final product is a soft blue annealed sheet with a coating of magnetic oxide.

Patent No. 756,473, to Walter Clasper, for manufacture of sheet-iron, granted April 5, 1904, on an application filed January 24, 1903.

Patent No. 756,474, to Walter Clasper, for apparatus for the manufacture of sheet iron, granted April 5, 1904, on an application filed January 24, 1903.

The process is substantially the same in each of these Clasper patents, and they will be considered together.

The process is summarized in the 756,-473 patent as follows: "In carrying out my method the sheets are annealed in bulk in the usual way, and then by means of the apparatus described the annealed sheets are first heated to a low cherry-red, this heating being done singly, so as to expose both faces of all of the sheets to the same atmospheric and heat conditions. A mild diffused heat is maintained in the furnace, so as not to detrimentally affect the annealed sheets, but sufficient to bring all of the sheets to a uniform color. The sheets are passed singly and in a progressive manner through this bluing-furnace and are then cooled by being passed singly and progressively over the cooling-box described, being there subjected to the blasts of cold air. These blasts are so arranged as to cool the sheets slowly, so as not to detrimentally affect them, but with sufficient rapidity to produce a uniform thin coating of oxide on the surfaces of said sheets."

Defendant's contention, that the bluing atmosphere of these patents corresponds

with that of the patent in suit, cannot be sustained.

The bluing is done by air alone, as the earlier patent says: "cooling said sheets by means of an air blast in order to produce uniformity of color."

The desirability of this is apparent as the same patent states: "to have the sheets come from the annealing-box or furnace they will be found to be of a variety of colors. * * *"

Patent No. 795,218, to Harry Homer Goodsell, for furnace for treating sheet iron and steel, granted July 18, 1905, on an application filed July 29, 1904, renewed June 27, 1905.

Patent No. 803,337, to Harry Homer Goodsell, for metallurgical furnace, granted October 31, 1905, on an application filed February 25, 1905.

These two patents are for magnetic oxide coatings, and will be considered together.

The following is a fair description of the process of the earlier patent: The plates of iron or steel to be blue annealed are placed upon rollers at the front end of the furnace. The rollers being in motion pass the sheets into the bluing chamber, where they are subjected to the action of steam. This steam passes from a cooling chamber into the bluing chamber, and is gradually raised to a higher temperature as it approaches the front end of the furnace; in the immediate vicinity of the door the steam is at a temperature of 900° to 1600° F. The sheets being introduced meet with hot steam and are heated to a dull cherry-red, and as they move along they gradually cool down until when they arrive at the cooling chamber, they are at a temperature not much higher than 212° F. The sheets then pass through a water bath. The blue coating is due, of course, to magnetic oxide formed by the action of the steam in the hot chamber.

The process is reversed in the later patent, the sheets going first into the water bath and then into the steam chamber.

Goodsell, in his 795,218 patent, in describing the nature of his product, says that among other requisites, a properly finished plate must be soft and well annealed, and in his later patent says that his plates may be used for stove-body work.

Patent No. 1,141,769, to John E. Carnahan and Arthur J. Maskrey, for method of oxidizing steel or iron sheets, granted June 1, 1915, on an application filed August 16, 1912. This patent was cited as a reference by the Patent Office, and the patent in suit issued over it. It is for the process of bluing sheets which have already been annealed.

The patentees say that they have discovered that when sheets have been heated in bluing above 700° to 900° F., excessive oxidation occurs, and that superheated steam makes the sheets more susceptible to rust or corrosion, and therefore they propose to operate within the temper color range, which they give as 430°–600° F. The sheets are conveyed on endless chains through a heated tunnel chamber and coloring is accomplished by admission of air. The tunnel chamber is heated to a bright red heat 1500°–1700° F., which is above the critical temperature of razor blade steel, but it does not necessarily follow that the steel sheets under treatment attain such a temperature. The temperature attained by the sheets depends upon the length of time the sheets remain in the tunnel chamber. The purpose of the teaching of the patentees is to blue the steel at temperatures not exceeding the specified range, and in no case reaching 700°–900° F., because such excessive heating "results in a loss by destroying the commercial value of the sheet, and by the useless expenditure of fuel, for producing the excessive heat." The patentee says that the temperature in this chamber is "somewhat in excess of the temperature required for oxidizing the sheets to make the desired color on their surfaces." Passing the sheets through this highly heated chamber enables the patentees to attain their desired temperature more quickly, and this speeds up production. This patent is really for producing a temper blue sheet.

Patent No. 1,192,347, to Ambrose Ridd, for method of bluing sheets and plates, granted July 25, 1916, on an application filed March 27, 1916. The sheets to be blued are heated in a muffle to a temperature of 750°–1000° F., which is below the critical temperature, and then gradually drawn out to the air where they become successively oxidized to a blue color. The steel is very soft, and the coating formed is magnetic oxide.

Patent No. 1,787,977, to Frank A. Fahrenwald, for process of heat-treating steel, granted January 6, 1931, on an application filed June 25, 1928. The patentee states

the object of the patent as follows: "the provision of a process for producing on the surface of the steel at the very beginning of the heat treatment a thin, uniform, fine-grained, tenacious, adherent, impervious protective coating which shall shield the steel from oxidation during the remaining steps of the process, and shall also to a considerable degree protect the same from subsequent scaling and weather-oxidation, but without impeding subsequent operations on the metal such as drawing, pickling, painting, etc."

What the patentee desired was to prepare a preliminary coating of magnetic oxide, not thick enough to scale, but sufficiently thick to prevent corrosion until the sheets are cleaned (pickled) or painted.

The patentee was working on low carbon steel which is very soft, and is used for automobile bodies and fenders, which require steel that may be easily formed into the required shapes.

The patentee can only obtain a soft annealed sheet, as he says: "The important procedures are two in number, viz.: that the heating of the steel is effected in an atmosphere which is limitedly oxidizing to ferrous metal at the temperature employed for the first step of the process, namely, the heating above the critical range; and, second, the cooling below the critical range is effected, in this same limitedly oxidizing atmosphere, after which the sheet can be discharged into a fully oxidizing atmosphere as quickly as one pleases."

These important procedures are illustrated on a chart. The patentee does not specify the various temperatures involved in his process. The critical temperature of the kind of steel he was using ranges from 1700° to 1750° F. He states that it is possible to discharge the sheets from the furnace "at a red heat, e. g. about 1400 F." This is substantially below his critical temperature.

He describes the coating produced by his process as follows: "The surface of the sheet looks and acts much as does that of a heat-resisting chromium alloy, that is, it exhibits a silky, glossy sheen, often shown (sic) iridescent colors when hot but nearly black when cold and without any roughness."

His final product is, of course, too soft for razor blade purposes.

Defendant's suggestion of quenching while above the critical point would be contrary to Fahrenwald's teachings. An attempt to heat razor-blade steel to Fahrenwald's critical temperature would be injurious, due to overheating. The contention of defendant's expert, that cooling along one of the curves (G H) of Fahrenwald's chart would give a substantially harder steel than cooling at the slower rate represented by the upper curve, seems to me to require no serious consideration because, whatever he may have meant by the word "substantially," whichever of the two cooling rates was followed, the resulting product would be soft when compared with hardened razor blade. The reason for cooling at different rates is to provide the steel with different grain structures, giving different combinations of tensile strength and deep drawing properties.

Fahrenwald's process is really disassociated from producing any particular kind of steel and is limited to the production of some oxide coating in the early stages.

As to the composition of this coating, Fahrenwald said that he regarded it as ferrous oxide, although he did not commit himself to that composition. Even if this oxide were formed at some intermediate stage of the process, it would not persist when the steel was discharged into the air at the very high temperature 1400° specified by Fahrenwald.

Without reciting it in full, it is sufficient to say that the testimony of Dr. Waterhouse convinces me that the coating produced by Fahrenwald's process is one in which the magnetic oxide completely predominates. The question of color is unimportant, as it is only a preliminary protective coating over which paint or enamel is necessarily applied to give the required appearance.

Patent No. 1,824,608, to Francis Locke, assignor to J. D. Crosby Company, for method of making polished annealed stainless steels, granted September 22, 1931, on an application filed June 18, 1929. The patentee describes the process in his patent, as follows: The steel is passed through a furnace where it is annealed and also subjected to an atmosphere which has but a slight oxidizing effect upon it. The nature of the atmosphere is not further disclosed, except that it is desirable that it should not produce a heavy scale. The oxide which has been formed is removed by a combined pickling and electrolytic action, after which the steel is dried and buffed until it gets a mirror-like pol-

ish. He states that further processing would be impossible if the strip were not annealed.

This brings us to a consideration of the third and last group of patents, which may properly be described as "Non-oxidizing References," as they purport to teach how to prevent the formation of any oxide coating upon the articles being treated, or so to limit oxidation that it may be removed without difficulty, and their purpose is different from the blue annealing references and from the patent in suit.

Patent No. 1,732,244, to Samuel I. Salzman, previously discussed, and which was cited by the Patent Office, may properly be included in this group.

Patent No. 36,628, to George I. Washburn, for improvement in annealing iron and steel wire, etc., granted October 7, 1862. The patentee states the object and purpose of his invention is "to anneal wire in such a manner as. that it shall not be oxidized or 'scaled' * * *."

To accomplish his purpose he places a coil of the wire in the pot A, hermetically seals the pot, and subjects it to the "proper degree" of heat. As most wire is soft, this would be 1700°–1750° F., a temperature which would injure blade strip. At the same time carbon monoxide, which is reducing, or nitrogen, which is inert, is allowed to flow through the pot. He mentions these two gases because they do not oxidize or scale the wire. He also says that any other gases that have the "non-oxidizing property" may be used. The wire after cooling is bright, and the customary removal of oxide or scale by acid is not necessary.

The patentee says that some of the wire of commerce requires to be "blued," and when such wire is being annealed, some atmospheric air may be introduced into the pot, in small quantities, so as not to scale the wire, or some oxygen may be introduced, similarly controlled. What he is referring to is the only oxide he can obtain by these gases alone, a layer of magnetic oxide, thin enough to color the wire, but not so heavy as to scale off. He also mentions that a mixture of gases may be used, which will enable the operator to control the amount of the oxidation in the same manner, by which he would get only magnetic oxide and not scale, or altogether prevent oxidation so as to get a bright wire not requiring pickling in acid.

That patent does not teach how to get an atmosphere of slightly less oxidizing effect than atmospheric air, and containing both reducing and oxidizing constituents, as does the patent in suit. The patentee expressly limited his process to annealing and employed apparatus which would not be suitable for heating a continuously moving strip or for quenching, and a hardened razor blade strip could not be obtained with it.

Patent No. 436,969, to Thomas A. Edison, for method of and apparatus for drawing wire, granted September 23, 1890, on an application filed June 10, 1884: This patent is for an improvement over the wire treating process of the preceding patent, in that it provides for the drawing and annealing of wire as a continuous process. The patentee runs the wire through a heated tube C, provided at each end with stuffing boxes GG, which exclude the air. He says: "The oxygen within the chambers is quickly consumed, so that but little remains therein, leaving the wire surrounded by nitrogen, and hence the heating can be performed with but slight oxidation of the wire."

Patent No. 1,043,089, to William E. Gibbs, assignor to Gibbs Company, for apparatus for annealing wire, granted November 5, 1912, on an application filed September 4, 1909: In the apparatus disclosed the wire is to be heated by the passage of an electric current, and simultaneously subjected to the action of steam. Razor-blade strip cannot be heated in this manner, and subjecting steel to steam would produce a heavy scale of black magnetic oxide. I can see no pertinency of this patent to the process of the patent in suit.

Patent No. 1,121,884, to Richard T. Winn, assignor to James W. Leslie, for apparatus for tempering blades, granted December 22, 1914, on an application filed June 28, 1909: The razor blades are heated in a very restricted chamber, so that they are protected from air as much as possible, and similarly protected until they are hardened.

This patent requires no further consideration.

Patent No. 1,704,015, to Harry M. Naugle and Arthur J. Townsend, assignors to the Columbia Steel Company, granted March 5, 1929, on an application filed July 1, 1925. The patentee says: "The present improvement is particularly concerned with

the annealing of steel having a carbon content of less than .20%, for the reason that such a low carbon steel is best suited for deep drawing and forming or stamping operations."

That kind of steel would not be suitable for razor blades. The annealing furnace used may be about 126 feet long. Some atmospheric air may enter this furnace and slightly oxidize or discolor the steel, but does not form a scale which cannot be easily removed.

This patent differs from one for the production of a blue color, such as the patent in suit.

Patent No. 1,808,721, to Carl I. Hayes, for method for heat treatment, granted June 2, 1931, on an application filed May 25, 1929: It discloses a furnace for the treatment of tool steel. The patentee first points out that heretofore it had been difficult to control the metal enveloping atmosphere, and then says: "Thus, steels normally require an inert or non-reactive atmosphere, in order to eliminate oxidation and the resultant scaling and pitting; high speed steels, however, may be hardened by heat treatment in an atmosphere containing a slight, definite, excess of carbon monoxide."

A furnace is provided for heat treatment which permits an accurate control of the metal enveloping atmosphere.

The patentee says: "The essential feature of my present invention is the provision of means for introducing a film of gases to form a transparent, colorless curtain across the mouth or entrance of the furnace chamber which will seal or exclude atmospheric air * * *."

To do this he burns gas with air below the entrance to this furnace, allowing the products of combustion "to form a thin film or sheet 23 across the throat 24 of the chamber 12, the pressure of the gases serving to exclude the outside air from the work receiving chamber;"

He describes the effect as follows: "The work subsequently introduced being prevented from oxidizing while being subjected to the heat in the chamber."

The patentee makes no suggestion of bluing nor does he teach the proper atmosphere conditions necessary to produce bluing. The apparatus described is not suitable for the treatment of moving strip. The prior art does not show any single reference nor combination of references which teach how to produce ferrous oxide or hardened steel with a printable oxide coating which results from practicing the invention of the patent in suit. The prior art in evidence discloses only the production of unprintable acid and corrosion resisting magnetic oxide.

We must not lose sight of the fact that the experts for both parties were testifying with full knowledge of the disclosures of the patent in suit.

The defendant's contention of want of invention, in support of which it cites De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339; Kelley v. Heyman Process Corporation (D. C.) 3 F.Supp. 362, affirmed (C.C.A.) 69 F. (2d) 1008, is not sustained, as I am firmly convinced, from my examination of the prior art and all the evidence, that the characteristics of the gas mixture, and of the oxide, were not known prior to the invention of the patent in suit, and therefore the cases cited are clearly distinguished.

I find nothing in the file wrapper and contents that affects the validity of the patent. It contains no estoppel which would so limit the claims as to relieve defendant from infringement. It shows careful consideration by the Examiner, who cited a reference typical of each of the three groups to which I have referred, which he finally withdrew and the patent issued over them, and I cannot see that patent No. 1,626,713, to Alexander et al., adds anything to the art that was cited. It is true that the Examiner at first finally rejected the claims and an appeal was taken, but instead of preparing a statement in accord with Patent Office practice, the Examiner changed his opinion and allowed the application, whereupon the patentee was entitled to a return of the fee paid on filing the appeal.

The patent in suit has had commercial success. Undoubtedly a considerable part has been due to advertising, but still the merit of the invention itself has contributed to that success.

■ The patent in suit is valid.

This brings us to the question of infringement.

In the prior trade-mark and unfair competition action, Dr. Henry, defendant's expert, testified that the defendant introduced both air and illuminating gas into the hardening furnace simultaneously and

formed a blue coating of magnetic iron oxide on the strip. There was in that record no analysis of the oxide, and the expert apparently thought the coating was the same as on blue annealed sheet. The strip was hardened and tempered as in Gillette practice. That process embodied the essential features of the patent in suit, and if used between the issue date, February 20, 1934, and the filing of the bill herein, May 24, 1934, would constitute infringement of the claims in suit. The witness Nadeau, secretary and treasurer of the defendant, says that Dr. Henry's description was correct as of the time on which it was given, February 13, 1933, but that the defendant had not introduced illuminating gas into the entrance of the furnace since September or October, 1933, which was prior to issuance of the patent in suit.

I am convinced that the witness Nadeau was in error, and that the identical process was so used in March, 1934.

Without reciting all of the evidence. I am satisfied that the witness Fortis, a graduate mechanical engineer, employed by a firm of engineers on behalf of the plaintiff, visited the defendant's plant on March 14, 1934, at night, where he was introduced to the night foreman of defendant, who showed him around the plant, and saw the bluing furnace in operation with illuminating gas being introduced at the entrance to the muffle, and also observed the various operations in blade manufacture. Immediately after leaving the plant on that occasion, he made a sketch of the bluing furnace and also a floor plan of the plant, Exhibit 39. On March 18, 1934, he made from these sketches the floor plan, Exhibit 5, and the drawing of the bluing furnace, Exhibit 6.

As described by Fortis, with reference to Exhibit 6, the bluing arrangement was as follows: The soft, white perforated steel B passed between two felt pads C, at the furnace entrance and into the hardening and bluing furnace E, the temperature of which was about 1500° F., which are recorded on his notebook sketch, Exhibit 40. From this furnace, the strip went through the water-cooled quenching blocks H. He saw a gas flame G enveloping the steel between the exit of the furnace and these quenching blocks, to prevent air oxidation. The steel next went through the tempering furnace N, maintained at a temperature of 260° F., over fishtail burners O, to further temper the blade centers, and then to the reel $A_2$. He saw that the steel on the reel was colored blue. Illuminating gas was introduced into the entrance of the hardening furnace through the flattened copper nozzle D, connected by a rubber hose to the gas pipe F, the same pipe from which the exit gas flame G came. The foreman told Fortis that the amount of gas going into the bluing furnace could be controlled by the gas cock shown in Exhibit 6, and demonstrated the effect upon the resulting color by varying the amount of gas supplied.

The sketch made by Fortis during the trial, Exhibit 11, clearly shows the arrangement of the nozzle in the furnace entrance; a blackened portion being shown representing the opening in the furnace into which the gas nozzle D was inserted. It also shows and Fortis testified that this opening was slightly larger than the cross-section of the nozzle. The air necessary to supply the oxidizing constituents for the bluing operation entered the furnace through this opening.

This process is similar in all its essentials to that of the patent in suit.

Notwithstanding Nadeau's denial that the process described by Dr. Henry had been used since October, 1933, the defendant attempted to show that such introduction of gas for bluing, even if it had been used within the infringement period, did not come within the patent in suit; but the opinion of the defendant's expert that there is no infringement is based solely upon what I have hereinbefore shown to be his erroneous interpretation, that the patent in suit is limited to a noncombustible mixture of illuminating gas and air.

Exhibits 7, 8, 9, and 10 were obtained by Fortis during his visits. The product of the defendant's process is identical with that of the patent in suit. The blades are hard and are coated with a blue oxide coating, which is ferrous oxide and not magnetic oxide. The defendant's expert testified that he analyzed the coating on defendant's blades and concluded it was magnetic oxide.

In my opinion his tests were not sufficient, and I believe greater weight should be accorded to the tests of plaintiff's experts Dr. Waterhouse and the witness Chapman, a chemist of considerable analytical experience with iron and steel.

Defendant denies that it has used a process in which gas was introduced into

the front of the bluing furnace at any time since September or October, 1933, and says that it has used another process since that date.

As I said before, I am convinced that defendant's witness Nadeau was clearly in error in his testimony of the abandonment of the introduction of gas in September or October, 1933. His testimony on that point is uncorroborated, although defendant's night foreman was called and could have been interrogated on this point.

Not only is Nadeau contradicted by the evidence of Fortis as to what he found in March, 1934, but also by the witness Zidlicky, another investigator employed by Hammer & Schwarz, on behalf of the plaintiff, who, without knowledge of Fortis or his sketches, visited the plant of the defendant and was introduced to the same night foreman, on the evening of January 17, 1935, and found that the defendant was still introducing illuminating gas to the front of the furnace, as Dr. Henry testified, in February, 1933. On the following day Zidlicky made his report, and on January 22, 1935, made a sketch of the bluing furnace, Exhibit 44.

Zidlicky made another visit to the plant on January 31, 1935, and again saw the bluing furnace in operation. He made a sketch, Exhibit 47, which shows a slight modification in the means for introducing illuminating gas into the front of the bluing furnace.

The process that was in use in March, 1934, infringes.

While the defendant contends it has used the so-called new process since September or October, 1933, and I am convinced that it did not but was using the old process up to January, 1935, it is not necessary to definitely fix that time, because even if the defendant be correct as to the time when the so-called new process was put into operation, it infringed the patent in suit.

This process is essentially the same as the defendant's former one, except as to the simultaneous introduction of air and gas at the entrance of the muffle. I agree with the following description by Dr. Waterhouse: "In the second process air enters to a certain amount, with the strip of steel, into the muffle, and against the exit end is a flame of burning gas which has been described as a luminous flame, and we have also been informed that the direction of the flame is directed against the exit end, away from the cooling block, and a certain amount of the products of combustion of the unburned gas enters the space between the muffle and the heating element and enters the muffle through the holes we have heard described and through the joint between the two halves of the muffle, and passes out along with the current of air to the exit end."

Defendant's expert contends that no illuminating gas gets into the muffle, and states that the blue coating is formed entirely by the oxidation which occurs, due to the presence of a restricted quantity of oxygen in the muffle, diluted with inert nitrogen, both gases being derived from the air; nor, according to him, is there a controlled oxidizing effect "other than one which is purely accidental or fortuitous." He, however, testified: "I must have a valve by which I can increase or decrease the oxidizing effect."

I cannot agree with the defendant's expert, that defendant's process involves nothing more than oxidizing by air, as in tempering or blue annealing; on the contrary, the apparatus as described was designed to accomplish bluing in accordance with the teaching of the patent in suit.

The presence of reducing gas is necessary to produce the ferrous oxide coating on defendant's blades, and it is not possible to get the blue ferrous oxide coating with air and inert nitrogen, but both oxidizing and reducing gases are necessary.

I am not impressed with the experiments which the defendant's expert testified to having made, to show that defendant's new process was not intended to use illuminating gas within the muffle, except that to me they show that clear blades could be made by the introduction of illuminating gas in sufficient quantity, and by excluding the air, thus preventing oxidation.

Nor do I find the tests of the defendant's expert, at the exit end of the bluing furnace, to be more impressive. Carbon dioxide is an oxidizing gas, and by its use no reducing gases were introduced, and of course it scaled the blade strip. When he substituted a large candle for the gas jet, which candle flame was not derived from illuminating gas, as was to be expected he obtained a satisfactory blue coating as the candle flame contained the combination of gases which could work into the muffle and

accomplish bluing. When he had an oxidizing gas alone, the strip scaled; when he had both oxidizing and reducing gases at the end of the furnace, blue was obtained.

The so-called new process utilizes the essential features of the patent in suit, and infringes the claims in suit of the patent in suit.

A decree may be entered in favor of the plaintiff against the defendant, with injunction, costs, and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion, for the assistance of the court, as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723), and rule 11 of the Equity Rules of this court.